[No. F024600. Fifth Dist. Mar. 9, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD L. COOK, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, II, IV, V, VI and VII.

**COUNSEL**

Stephen Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Mary Jo Graves and Jesse Witt, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**VARTABEDIAN, J.**—Defendant Edward L. Cook appeals his conviction for first degree murder. He contends the trial court erroneously excluded

evidence proffered to suggest that another person committed the crime. He also argues the court erroneously admitted the testimony of a person who accompanied defendant at the time of the killing, an error compounded by the court's failure to instruct the jury on third party culpability evidence. Defendant further asserts error in the court's failure to instruct on aiding and abetting, a claim we discuss in the published portion of this opinion. Additionally, he faults the court for not giving a pinpoint instruction and claims trial counsel inadequately represented him in not requesting certain instructions. Finally, he says the court did not apply the correct standard when it rejected his request to be sentenced to a term permitting the possibility of parole. All of these contentions fail. We affirm the judgment.

## *Facts and Procedural History*

In the evening of August 21, 1994, defendant, then 16 years old, asked his friend Adolph if he was "down for a 187." Adolph apparently thought a "187" was a robbery. The boys went out to the railroad tracks that ran behind the house where defendant was living. A frequently traveled dirt path ran alongside the tracks. The boys saw Donald Thornton, whom they did not know, walking along the path carrying a shopping bag. Defendant said, "Well you wanna get him?" Adolph said, "I don't care." The boys approached Thornton.

Defendant confronted Thornton using the command "break yourself" or "brake yourself." Adolph thought this meant "give up your stuff." Thornton began to retreat and then dropped his bag. Adolph picked up the bag, which contained three or four cans of beer. Adolph began to leave with the beer. Around seven feet away, Adolph turned and saw defendant's fist slamming into Thornton's side three or four times; he saw nothing in defendant's hand. Adolph turned away again. Seconds later, defendant caught up with Adolph. Laughing, defendant said he had stabbed the man. Adolph saw defendant was holding a pocketknife. The boys went back to defendant's house and drank the beer.

The next day, Adolph told his brother Marcus about the killing, saying "we did something stupid." Later that day, defendant told Marcus "he had stabbed some guy on the tracks late at night that night before."

Two days later, defendant told his girlfriend, Misty, about the killing. He said he and "his homies" stabbed the man for a six-pack of beer. The next day, defendant told Misty additional details. On August 26, 1994, Misty secretly called the police. Misty obtained further details from defendant. Defendant said he had stabbed the man and that only Adolph had been with

him. He also said he had taken $200 from the man, that they had worn ski masks as a disguise, and that he previously had killed people in Los Angeles, none of which apparently was true.

Three weeks later, detectives picked up Adolph for questioning. Adolph first claimed he did not know what the detectives were talking about. After they told him they knew defendant had killed Thornton and that Adolph was equally as likely as defendant to be convicted of first degree murder unless he cooperated, Adolph confessed. He described defendant's role in the robbery and murder essentially as set forth above.[1]

The detectives then questioned defendant, who stated he and Adolph had been home all evening. He persisted in this claim even when the detectives told him about Adolph's confession. "You have my story; I have my witnesses," defendant repeatedly proclaimed. The detectives arrested defendant.

After the juvenile court found defendant an unfit subject for juvenile proceedings pursuant to Welfare and Institutions Code section 707, the district attorney filed an information in superior court charging defendant with murder. (Count 1; Pen. Code,[2] § 187.) The information alleged as a special circumstance that defendant committed the murder during a robbery. (§ 190.2, former subd. (a)(17)(i).)[3] The information also alleged robbery as a separate count. (Count 2; § 212.5, former subd. (b).)[4] As to both counts, the information alleged defendant personally used a knife in the commission of the offense. (§ 12022, subd. (b).) Defendant pleaded not guilty; he subsequently added a plea of not guilty by reason of insanity.

On April 5, 1995, a jury found defendant guilty as charged. The next day the jury found defendant was sane when he committed the crimes.

Defendant filed a motion for new trial. The court denied the motion and sent defendant to the Youth Authority for evaluation pursuant to Welfare and Institutions Code section 707.2. On September 1, 1995, after the arrest on a bench warrant of a subpoenaed defense witness who had failed to appear for trial, defendant renewed the new trial motion. The court again denied the motion.

---

[1]Adolph was arrested for murder at the conclusion of the interview. Subsequently, Adolph was permitted to admit a juvenile petition alleging robbery and was committed to the California Youth Authority (hereafter Youth Authority) for up to five years. The plea was part of a bargain by which the murder charge was dismissed in return for Adolph's agreement to testify "truthfully" in the present case.

[2]All further code references are to the Penal Code except as otherwise stated.

[3]Now section 190.2, subdivision (a)(17)(A).

[4]Now section 212.5, subdivision (c).

At the sentencing hearing on September 19, 1995, the court found defendant was not amenable to treatment at the Youth Authority. The court declined to exercise its discretion to impose a lesser sentence pursuant to section 190.5, subdivision (b). It imposed a sentence of life in prison without possibility of parole. The court also imposed a one-year sentence on the weapon-use enhancement. The same day, defendant filed his notice of appeal.

*Discussion*

I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III. *Aiding and Abetting Instruction*

 Defendant contends "[t]he trial court failed to instruct . . . [on] the mens rea necessary to establish appellant's culpability as an aider and abettor in the robbery and robbery-murder." As the argument is further explained in defendant's reply brief: "Where the prosecution's theory of the robbery count was that a key element was performed by an accomplice, the jury must be instructed on aiding and abetting." In particular, he says, the only credible evidence concerning the robbery showed that Adolph actually took the beer.

Defendant cites no authority for the proposition that when a "key element" of a crime is performed by another person, any accomplice is merely an aider and abettor. Although we have found no California case discussing this issue in any detail, we conclude defendant is wrong and that the evidence at trial clearly showed that defendant was guilty, if at all, as a direct perpetrator of the robbery.

 In some important ways, the law does not distinguish between perpetrators on the one hand and aiders and abettors on the other. The Penal Code provides: "All persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (§ 31; see also § 971.) As such, aiders and abettors are subject to the same range of punishment as direct perpetrators.

Despite their equal status as principals in the crime, in other instances the law does distinguish between direct perpetrators and aiders and abettors. In

*See footnote, *ante*, page 1364.

part, this is because the actions of a purported aider and abettor are often more peripheral and ambiguous than those of the direct perpetrator. (*People v. Beeman* (1984) 35 Cal.3d 547, 559 [199 Cal.Rptr. 60, 674 P.2d 1318].) Indeed, actions causally facilitating the crime may be entirely innocent. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 413 [30 Cal.Rptr.2d 525].) Therefore, in order to ensure that the purported aider and abettor has the mens rea consistent with criminal liability, case law has established that such a person must "act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman, supra,* 35 Cal.3d at p. 560, italics in original.) Thus, while the criminal liability of an aider and abettor is the same as that of a direct perpetrator, the required mental states differ between the two classes of principals.

 Despite the fact that trial courts must frequently determine whether a defendant is potentially an aider and abettor instead of a direct perpetrator, so as to determine whether to give the pattern aiding and abetting instruction (see CALJIC No. 3.01), we find only scant appellate discussion of the difference.

In *People v. Talamantez* (1985) 169 Cal.App.3d 443 [215 Cal.Rptr. 542], two men kidnapped another man and beat him to death. Talamantez contended he did not inflict the fatal blow and that the trial court had given an erroneous instruction concerning the intent necessary to find him guilty of the murder on an aiding and abetting theory. The appellate court concluded the instructional error was harmless. Among its reasons, stated without a discussion of the applicable law, was that, as a participant in the beating, Talamantez was a perpetrator of the torture that culminated in the victim's death. The court stated: "The fact (if it be a fact) that Talamantez did not strike the final torturous blow that broke Heggie's voice box and caused his death does not convert him factually into an aider and abettor to torture murder. These bitter convicting facts show him violently beating, torturing Heggie up to the point of Rozzo's coup de mort." (*Id.* at p. 463.) Accordingly, Talamantez perpetrated the murder.

In the recent case of *People v. Rose* (1997) 56 Cal.App.4th 990 [65 Cal.Rptr.2d 887], the issue was whether Rose was entitled to have his felony conviction reduced to a misdemeanor pursuant to section 659.[11] Rose and another person entered a store to steal a purse. The other person actually left

---

[11]Section 659 provides: "Whenever an act is declared a misdemeanor, and no punishment for counseling or aiding the commission of such act is expressly prescribed by law, every person who counsels or aids another in the commission of such act is guilty of a misdemeanor."

the store with the purse. She was permitted to plead guilty to petty theft with a prior, as a misdemeanor. Rose, however, had prior serious felony convictions and was charged under the three strikes law. Convicted of second degree burglary, he was sentenced to 25 years to life. In the trial court and on appeal he contended he should be convicted only of a misdemeanor since the person he aided and abetted was only convicted of a misdemeanor. The appellate court rejected this claim for a number of reasons, among·them the following: "Finally, defendant was not an aider and abettor of the burglary. He personally entered the store with the intent to aid Allen in the theft of the handbag." (56 Cal.App.4th at p. 994.) Again, however, there was no discussion of the applicable law.

In *People* v. *Croy* (1985) 41 Cal.3d 1, 12 [221 Cal.Rptr. 592, 710 P.2d 392], footnote 5, the Supreme Court stated in dicta the following: "Like the conspirator whose liability is predicated on acts *other than and short of those constituting the elements of the charged offense*, if the acts [of the aider and abettor] are undertaken with the intent that the actual perpetrator's purpose be facilitated thereby, he is a principal and liable for the commission of the offense." Impliedly, then, one whose acts do not fall short of acts "constituting the elements of the charged offense" is not an aider and abettor, but is an "actual perpetrator."

Neither *Croy*, *Rose* nor *Talamantez* discusses the basis for its statement concerning the distinction between direct perpetrators and aiders and abettors.[12] Yet all three decisions readily can be explained by reference to the common law as it existed before the adoption of section 971. At common law, principals in a crime were divided into two degrees. A principal in the first degree "engages in *criminal conduct* by his own hand" or commits the crime through his constructive presence. (1 Wharton's Criminal Law (15th ed. 1993) Parties, § 30, pp. 183-184, italics added.) By contrast, "a principal in the second degree is a person who is present at the scene of a crime, but *does not engage in the criminal conduct*; he merely aids and abets the principal in the first degree in committing the crime." (*Id.* at § 31, p. 186, italics added, fn. omitted.) An aider and abettor not present at the scene of the crime was known at common law as an accessory before the fact. (*Id.* at § 32, p. 193.)

While section 971 abolished the pleading and punishment distinctions among first degree principals, those of the second degree, and accessories,

---

[12]In a related context, this court has held that a defendant was not liable as an aider and abettor because there was no evidence that a child who committed the lewd act in question had the intent necessary to convict that child as a perpetrator who could be aided and abetted. Nevertheless, the defendant, even though he did not personally commit the touching, could be criminally liable as an actual perpetrator on the theory of constructive touching or because he committed the crime through an "innocent agent." (*People* v. *Pitts* (1990) 223 Cal.App.3d 606, 874-875 [273 Cal.Rptr. 757].)

nevertheless, the former common law categories make explicit what was implicit in *Croy*, *Rose*, and *Talamantez*: one who engages in conduct that is an element of the charged crime is a perpetrator, not an aider and abettor, of the completed crime. Thus, appellant's proposed formulation of the rule, if "a key element was performed by an accomplice, the jury must be instructed on aiding and abetting," is essentially the reverse of the correct rule: If the defendant performed an element of the offense, the jury need not be instructed on aiding and abetting, even if an accomplice performed other acts that completed the crime.

In this case, the uncontradicted evidence (apart from the identity issue) was that defendant provided the "force or fear" necessary to accomplish the robbery. As such, he was one of the direct perpetrators of the offense of robbery, even if he did not physically deprive the victim of his property. No aiding and abetting instruction was necessary.[13] In determining that defendant actually committed the robbery, the jury necessarily found he had the specific intent to deprive Thornton of the beer.[14] There was no requirement that the jury also find that he had the specific intent or purpose to facilitate Adolph's commission of the crime.

## IV.-VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[13]Since defendant was a direct perpetrator of the robbery, *People* v. *Pulido* (1997) 15 Cal.4th 713, 726-728 [63 Cal.Rptr.2d 625, 936 P.2d 1235], which defendant relied on at oral argument, is inapplicable.

[14]We recognize that a portion of the robbery jury instruction is written in the passive voice. As such, it requires that the jury determine whether "[t]he property was taken with the specific intent permanently to deprive such person of the property." (CALJIC No. 9.40.) Taken in isolation from the other instructions and in light of the theory that only Adolph had the intent to steal, there is an abstract possibility a juror could determine "a robbery had been committed" without determining beyond a reasonable doubt that every element was satisfied *as to defendant*. In the context of the other instructions and the arguments of counsel, there is no reasonable possibility of actual misunderstanding. Thus, the special circumstances instruction required that the murder was committed "while *the defendant was engaged* in the commission of a robbery" (CALJIC No. 8.81.17), not merely that the murder was committed "during a robbery." Similarly, the initial summary of the elements of robbery in the robbery instruction itself is written in the active voice: "Every person who takes personal property in the possession of another . . . with the specific intent permanently to deprive that person of the property, is guilty of the crime of robbery . . . . " (CALJIC No. 9.40) Finally, counsel reminded the jury that "every element of every crime, every element must be proved . . . beyond all doubt based on reason. And that means that the intent to rob must be proven beyond all doubt based on reason." Counsel's theory was that there probably was no beer to take because Thornton had already consumed it, and that whoever killed him did not intend to rob him because the killer left money in Thornton's pockets. Counsel did not argue that Adolph but not defendant had the intent to steal, although that theory of the case is implied in counsel's request for a pinpoint instruction on intent to steal.

*See footnote, *ante*, page 1364.

*Disposition*

The judgment is affirmed.

Dibiaso, Acting P. J., and Buckley, J., concurred.

A petition for a rehearing was denied April 7, 1998, and appellant's petition for review by the Supreme Court was denied June 17, 1998.