Filed 5/28/13  P. v. Swayne CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CHELEIA SWAYNE,<br><br>        Defendant and Appellant. | A133761<br><br>(Alameda County<br>Super. Ct. No. CH49879A) |

## I.  INTRODUCTION

Appellant Cheleia Swayne was convicted by a jury of four counts arising out of a car crash in which she was driving at high speed while under the influence of alcohol, hit a curb, and slammed head-on into a gas station pole.[1]  When police arrived, the car was on fire and the front seat passenger was engulfed in flames.  The two back seat passengers were rescued but sustained serious injuries.  Appellant contends the trial court erred in admitting evidence of her responses to police questioning at the scene before she was advised of her *Miranda* rights, the court prejudicially misinstructed the jury on aiding and abetting and on the definition of "driving," and cumulative error.  In addition, appellant argues, and respondent concedes, a sentencing error.  We will reverse the sentence, remand for resentencing, and affirm the judgment in all other respects.

---

[1] Appellant's codefendant, Damarcus Thompson, was tried and convicted in the same proceeding.  His appeal is pending in case number A133858.

1

## II. FACTUAL AND PROCEDURAL BACKGROUND

On June 14, 2011, the Alameda County District Attorney filed a consolidated information charging appellant and Damarcus Thompson with gross vehicular manslaughter (Pen. Code, § 191.5, subd. (a)), with an allegation that Thompson fled the scene of the crime (Veh. Code, § 20001, subd. (c)) (count 1), and driving under the influence of alcohol and causing personal injury (Veh. Code, § 23153, subd. (a)) (count 2). The information also charged appellant with driving with a 0.08 percent blood-alcohol level and causing injury (Veh. Code, § 23153, subd. (b)) (count 3) and driving when her driving privilege was revoked (Veh. Code, § 14601.2, subd. (a)) (count 4). In count 5, the information also charged Thompson with leaving the scene of an accident involving injury (Veh. Code, § 20001, subd. (a)).

As to count 2, the information alleged that appellant and Thompson caused bodily injury and death to multiple victims (Veh. Code, § 23558), drove at an excessive rate of speed (Veh. Code, § 23582), and caused great bodily injury to La'Camii Ross, Everett Jackson, and Jalisha Harris, elevating the offense to a serious felony (Pen. Code, § 1192.7, subd. (c), 12022.7, subd. (a)). Count 3 contained these same alleged enhancements against appellant.

The matter went to trial before a jury, and the following evidence was adduced.

Before the Crash

On August 14, 2009, Jalisha Harris and appellant spent the afternoon together riding around in appellant's boyfriend's black Lexus. Appellant was driving and Harris sat in the other front seat. When it got dark, they drove to their friend Rob's house in East Oakland. Harris, appellant, and Rob stood outside talking on the driveway. At around 8:00 p.m., appellant bought a pint of Amsterdam gin and drank it with Harris for an hour until it was empty. Appellant went back to the liquor store and bought another pint bottle of Amsterdam gin which she shared with Harris and one or two other people until it was empty. Harris felt "tipsy" and she testified that appellant was in the same condition, i.e., intoxicated but able to speak and walk normally.

La'Camii Ross was dropped off at the house where Harris and appellant were standing in the driveway. No alcohol was being consumed at this point, and the group hung out for another hour. Around midnight, Harris asked appellant to drop her off at the Alvingroom Apartments and to pick her up an hour later.

When Harris came outside to be picked up, she saw the Lexus in the parking lot with the right rear passenger door open. Everett Jackson was sitting in the middle of the back seat. The driver's seat was pushed so far back that no one could sit directly behind it in the back seat. Thompson sat in the driver's seat with appellant on his lap. Ross was in the front passenger seat. Harris got in the back seat on the right side behind Ross. She could not tell if anyone put on a seatbelt. She did not put on her seatbelt. Harris knew Jackson because she had dated him. She knew Thompson by his street name, "Devil."

As soon as she got in the car, it took off. Harris did not have a clear recollection of whose hands were on the steering wheel and she did not see whose feet were on the pedals. She recalled testifying previously that she saw appellant's hands on the wheel. She explained that she was not changing her story at trial, but that she had suffered memory loss and memory changes.

Although Harris felt the effects of intoxication, she had memories of the drive. She remembers leaving the driveway of the apartment complex, turning left on Macarthur Boulevard, and going fast. The car was traveling at "freeway speed." She did not remember any stops and did not remember if she was awake during the drive. The last thing she remembered was seeing the Quik Stop on Macarthur Boulevard in San Leandro.

Everett Jackson had been hanging out at his grandmother's house on 100th Avenue and Macarthur Boulevard on the evening of August 14. He was with a group of people including his cousin Damarcus Thompson. They were drinking Amsterdam gin out of two or three pint-sized bottles.

Some time before midnight, the group congregated outside a nearby bar called the Sports Page. Before arriving at the Sports Page, the group bought more alcohol. Jackson saw Thompson drinking alcohol and observed that Thompson was "sort of" experiencing the effects. After the bar closed at 2:00 a.m., appellant drove up in a black Lexus with

passengers Harris and Ross. Appellant got out of the car. Jackson got into the driver's side back seat. Thompson sat in the driver's seat and appellant sat on his lap. Jackson did not have his seatbelt on and he did not see Thompson or appellant put on the seatbelt, turn on the car, steer, or operate the pedals. The last thing Jackson remembered was seeing the Quik Stop in San Leandro.

The Crash and the Aftermath

On August 16, 2009, just after 3:00 in the morning, Shirley McGee was at home watching television when she heard a loud smash outside. She lived in an apartment on the corner of Grand Avenue and Joaquin Street in San Leandro. She went outside onto the porch and saw a car that had crashed into a pole at the gas station across the street. There was a lot of smoke in the car. McGee ran back into the apartment, grabbed her phone, and went back out to the porch. She called 911. From across the street, she could hear people inside the car crying loudly for help.

After calling 911, McGee saw a man walk out of the smoke of the crash site. He ran across the street towards McGee and proceeded towards the freeway. The man appeared to be hurt; he walked with a limp.

McGee called 911 two more times because the situation inside the car was getting worse—she could see fire—and help had not yet arrived.

At 3:19 a.m., Officer Michael Benz of the San Leandro Police Department was dispatched to the crash site. He arrived at the Coast Gas Station in the 1400 block of Grand Avenue in his marked police vehicle with the lights and siren activated. Before he parked, he could see a black male crossing the street from east to west, about 50 feet away. Officer Benz grabbed a fire extinguisher from his patrol car and ran towards the burning vehicle. He saw appellant sitting on a low retaining wall 20 to 30 feet away. She called out, "I'm over here, I'm over here." Officer Benz asked appellant if she was okay and then asked if she was the driver. Appellant said she thought her leg was broken and acknowledged that she was the driver.

Officer Benz heard a female voice from the burning vehicle yelling for help and saying she could not get out of the car. Officer Benz found Jalisha Harris in the back

4

seat, face down. Her lower torso, waist, and legs were in the car; her upper torso, arms, and head were outside the car on the ground. Not knowing the extent of Harris' injuries or if she was pinned inside the car, Officer Benz decided to try to put out the fire first. The majority of the fire was in the front passenger area of the car. The fire extinguisher was ineffective. Two other officers on the scene were also trying to put out the fire. Officer Benz could see someone in the front passenger seat. The officers pulled Harris from the car and set her down a safe distance from the car. They were unable to reach the front seat passenger because the fire was too intense. Officer Benz saw what appeared to be a pair of jeans on the rear floorboard. He also noticed that the gas pedal was pushed up to the driver's seat; it was significantly closer to the driver's seat.

Officer Liaquat Khan was on duty in north San Leandro when he heard Officer Benz's initial reports from the scene of the car crash. He decided to respond to the scene when he heard Officer Benz's voice become more excited and that the vehicle involved was fully engulfed in flames. When Officer Khan arrived, there were three patrol cars present, but no fire or medical personnel. The other officers were attending to Harris and appellant. Officer Khan approached to within five feet of the car on the driver's side and noted that the driver's door and left rear door were open all the way and that there was a person in the right front passenger seat. The fire was inside the car's passenger and engine compartments, and flames were shooting up about 10 feet into the air. Officer Khan heard moaning from the back seat and saw what initially appeared to be a pair of jeans, but turned out to be a person. Officer Khan could not get close to the person because of the flames, but kept trying, unsuccessfully, to put out the fire.

When the fire department arrived, Officer Khan told one of the firefighters that someone was alive in the back of the car. The fire department put out the fire and rescued a male later identified as Everett Jackson from the back seat.

After the fire was out, Officer Benz turned his attention back to appellant, who was still sitting on the retaining wall. She asked repeatedly if the other people in the car were okay. Officer Benz noted that she had red watery eyes, slurred speech with

5

deliberate pronunciation, and the odor of alcohol coming from her person. Appellant appeared disheveled and her attitude was indifferent.

Officer Benz asked appellant a number of standard questions from a form and recorded her answers in writing. She did not answer most of the questions, but said she had been driving from Oakland to San Leandro. After speaking with appellant, Officer Benz arrested her for driving under the influence of alcohol and causing injury. Appellant was then transported to the hospital.

Codefendant Damarcus Thompson was not located at the scene of the accident.[2]

Everett Jackson was taken to Eden Hospital. Officer Benz saw him there in the trauma room. One of his legs was in a splint; he was hooked up to a ventilator; and he was unconscious.

Jackson had a broken leg and was unconscious for two weeks. He was then in rehabilitation care for six weeks. Ever since the accident, he has suffered memory problems and seizures. Apparently, he is no longer the person he was before the accident.

Officer Khan interviewed Jalisha Harris at the hospital and wrote down her statement: "I went to a club somewhere in Oakland with my cousin [appellant]. I don't remember how long we were at the club. While at the club, I took a couple of shots of alcohol. I know [appellant] was drinking too, but I don't know what or how much. After a while at the club, we, my cousin and two other men, left the bar in [appellant's] car. I don't know who the other two males were. [Appellant] was driving her boyfriend's black Lexus four-door. I was in the left rear passenger seat without my sealtbelt on. [Appellant] was driving home to San Leandro, but I don't know where she lives. I fell asleep at some point during our ride home. I woke after [appellant] crashed the car. I don't know who [sic] or how I got out of the car after the crash. I was injured as a result

---

[2] An arrest warrant was issued and Thompson was finally apprehended more than a year and a half later, in March 2011.

of the crash. My entire body including my neck hurts. Also have some cuts to my body as a result of the crash." Harris was physically unable to sign the statement.

Harris testified that she remembered seeing smoke and the paramedic standing over her as she was hanging out of the car door. Her neck hurt and she could not move. Harris woke up again in the intensive care unit of the hospital. She had suffered a broken neck and fractured her hand. She had to wear a metal halo screwed into her skull for three months. She had residual scars and long-term problems with her back, leaving her unable to work.

La'Camii Ross, the front seat passenger, died at the scene. Dr. Paul Herrmann performed an autopsy and testified at trial. Ross's "body was severely burned, charred on most of the skin surface," including most of her face, her teeth, and her ears. The charring continued on her neck, chest, abdomen, legs, arms, and hands. Dr. Herrmann noted a fractured ankle and fractured ribs, one of which lacerated her left lung. Ross had no serious head injuries, leading Dr. Herrmann to opine that Ross was alive when the fire started. She probably died within seconds by inhaling hot gas. The cause of death was blunt trauma and extensive thermal burns.

Jonathan Knapp, the director of the Valley Toxicology Forensic Laboratory, testified as an expert in impairment. Mental impairment begins to occur when a person's blood alcohol content is between 0.03 and 0.06 percent. At a level of 0.08 percent, an individual's visual focus and peripheral vision is detrimentally affected. At 0.15 percent, most people will lose all peripheral vision.

On August 21, 2009, an employee of Valley Toxicology Forensic Laboratory examined a sample of appellant's blood from the day of the incident. The result was a blood alcohol content of 0.12 percent. On October 18, 2010, Knapp conducted the test again because the employee who performed the first test was no longer working for the laboratory. The result was a blood alcohol content of 0.10 percent. Knapp testified that a reason for the lower blood alcohol level was the year-long period between tests and the volatile nature of blood specimens.

7

Officer Joe Molettieri, a traffic investigator for the San Leandro Police Department, concluded that the car first hit the curb of the street, traveled 40 to 45 feet, and then hit the pole. The front of the car hit the square cement block holding up the pole. There were no skid marks, which would have been evidence of braking.

Scott Sorensen, formerly a traffic division investigator for the Hayward Police Department, was trained in accident investigation and reconstruction. Sorensen performed a crush analysis and determined that the speed of the Lexus when it hit the pole was between 44.25 and 50.46 miles per hour. The speed limit on Grand Avenue is 35 miles per hour, and many of the posted speed limit signs along the route traveled by the Lexus were 30 miles per hour. Sorensen's calculations were based solely on the crush damage to the car, and established the minimum speed the vehicle could have been traveling at the time of impact. According to Sorensen, other factors such as flying debris, which did not figure into the crush analysis, indicated that the car's speed was actually higher.

Appellant is five feet eight inches tall. Thompson is five feet five and a half inches tall with shoes on; he is five feet four inches without shoes. The distance from the Sports Page bar to the crash site is approximately 4.2 miles. There were at least seven controlled intersections along the driving route.

Detective Brian Anthony of the Albany Police Department, formerly a patrol officer, testified that, on June 14, 2008, at around 2:26 a.m., he performed a traffic stop on a Dodge Intrepid driven by appellant. During the stop, he issued appellant a written suspension and revocation order and orally informed appellant that her driving privilege was suspended. The suspension was based on a preliminary alcohol screening device which showed the presence of alcohol.

Both defendants were convicted by the jury as charged. The court sentenced appellant to 15 years, four months in state prison. Thompson was sentenced to 20 years, 10 months.

Appellant filed a timely notice of appeal.

# III. DISCUSSION

A.  *Motion to Exclude Evidence of Appellant's Responses to Questioning at the Scene.*

Appellant contends that the trial court erred in denying her motion to exclude evidence of her responses to police questioning prior to being advised of her *Miranda* rights at the scene of the accident.  She argues that as soon as Officer Benz suspected that she was driving under the influence of alcohol, she was not free to leave and should have been advised of her rights before the officer began asking her the list of standard investigative questions.

1.  *Factual background.*

Appellant moved in limine to exclude statements she made to Officer Benz at the crash scene.

Officer Benz testified at a pretrial Evidence Code section 402 hearing that, at around 3:19 a.m. on August 15, 2009, he was dispatched to the scene of a vehicle accident involving injuries near 1401 Grand Avenue in San Leandro.  When he pulled up, he noticed a black male walking away from the area and saw a car that had crashed into a pole and was on fire.  He approached the vehicle and saw appellant sitting 20 to 30 feet away on a low retaining wall.  Appellant was yelling, "I'm over here, I'm over here."  Officer Benz asked if she was the driver of the vehicle and appellant said, "Yes, I'm over here."

After assisting with the car and the people trapped inside, Officer Benz returned to where appellant was still sitting on the retaining wall.  Officer Benz asked appellant her name and requested her driver's license.  Appellant did not respond.  She repeatedly said her leg was broken and asked about medical assistance.  She did not give her name to the officer.

Officer Benz testified that he did not place appellant in handcuffs and she was not in custody or under arrest.  While speaking with her, Officer Benz noticed "a moderate smell of alcohol coming from her person," and saw that her eyes were red and watery.  Her speech was deliberate, and rambling at times.  Officer Benz suspected that appellant

9

was under the influence of alcohol and he proceeded to ask her the standard questions he uses in every DUI investigation.

Officer Benz asked her where she had been driving, and appellant responded that she was driving from Oakland to San Leandro. Appellant did not answer his questions about any mechanical problems with the car or whether she had any medical conditions. Appellant kept saying her leg was broken, and the officer repeated that an ambulance was on the way. Appellant did not answer when asked if she knew where she was or how much she had had to eat or drink. Officer Benz did not ask appellant to perform field sobriety tests because of her injuries.

The trial court denied appellant's motion because it found no *Miranda* violation and ruled that the statements were admissible.

2.      *Legal Principles.*

"The prophylactic requirements of *Miranda* [*v. Arizona* (1966) 384 U.S. 436 (*Miranda*)] are familiar. In order to assure protection of the Fifth Amendment right against self-incrimination under 'inherently coercive' circumstances, a suspect may not be subjected to an interrogation in official 'custody' unless he has previously been advised of, and has knowingly and intelligently waived, his rights to silence, to the presence of an attorney, and to appointed counsel if he is indigent. . . . Statements obtained in violation of *Miranda* are not admissible to establish his guilt." (*People v. Boyer* (1989) 48 Cal.3d 247, 271, overruled on other grounds by *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) "Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*." (*Oregon v. Elstad* (1985) 470 U.S. 298, 307.)

"*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' " (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.) Whether an individual is "in custody" for *Miranda* purposes is an objective test and, where no formal arrest has taken place, is resolved by asking whether the circumstances "created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*People v. Aguilera* (1996) 51

10

Cal.App.4th 1151, 1162.) "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." (*Thompson v. Keohane* (1995) 516 U.S. 99, 112, fn. omitted.) Factors to consider in deciding the custody issue include the site of the interrogation, whether objective indicia of arrest were present, and the length and form of the questioning. (*People v. Boyer, supra,* 48 Cal.3d at p. 272.)

The United States Supreme Court has made clear that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323.) "It is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*. [Citation.] . . . Save as they are communicated or otherwise manifested to the person being questioned, an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the Miranda custody inquiry." (*Id*. at p. 324.)

Determining whether a defendant was in custody under *Miranda* is a mixed question of law and fact. (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) "When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, 'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave' [citation]." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

3.     *Analysis*.

Appellant argues that, when Officer Benz "suspected appellant was under the influence and began asking her the list of standard investigative questions," she was subjected to a custodial interrogation without first being advised of her *Miranda* rights.

11

In *Berkemer v. McCarty* (1984) 468 U.S. 420, a seminal case cited by both parties, the Supreme Court concluded that an officer's roadside questioning of a motorist detained pursuant to a routine traffic stop did not constitute custodial interrogation for *Miranda* purposes. (*Id.* at pp. 435-440.) The court reasoned that the circumstances did not sufficiently resemble custody because the questioning was brief and took place in public. (*Id.* at p. 437.) The court contrasted a station house interrogation, "which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." (*Id.* at p. 438.)

In another analogous case, *People v. Mosley* (1999) 73 Cal.App.4th 1081 (*Mosley*), our colleagues in the Second District held that the defendant's statements, made to the police while he was being treated in an ambulance for a gunshot wound following a drive-by shooting, were admissible despite his not having received the *Miranda* advisements. (*Id.* at pp. 1085, 1090-1091.) The officer asked the defendant what happened; the defendant's answers implicated him in the shooting. (*Id.* at p. 1086.) In holding that the defendant was not in custody when the officer questioned him, the court reasoned, "[a]ny restraint of defendant's freedom of action was caused by the need to treat his gunshot wound, which was still bleeding and was actively being treated during the interview. He had not been placed under arrest because the police did not know what had happened that caused him to be shot. . . . We also note that the questioning was not accusatory or threatening, that defendant was not handcuffed, that no guns were drawn, and that defendant was about to be transported to a hospital and not to a police station or jail." (*Id.* at p. 1091.)

Here, appellant was not in custody for *Miranda* purposes when Officer Benz questioned her at the scene prior to arresting her. She herself initiated contact with the officer, calling to him, "I'm over here, I'm over here." The questioning was brief and took place in public, in view of passersby, at the scene of the collision. Officer Benz was the only one questioning appellant, and the questions were non-accusatory and open-ended. He asked her, for example, if she was the driver of the car, if she knew where she

12

was, and if she had had anything to eat or drink. She was not handcuffed and was not required to perform field sobriety tests.

Appellant contends that she was not free to leave, i.e., in custody, both because of her injuries and because Officer Benz suspected that she had been driving under the influence of alcohol. We reject this argument. Any restraint on appellant's freedom of movement was caused by her injuries in the car crash, not by police action. (See *Mosley*, *supra*, 73 Cal.App.4th at p. 1091.) Moreover, the officer's suspicion that appellant had been drinking did not transform the investigative questioning into a custodial interrogation. Custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned," and thus Officer Benz's suspicion is not pertinent to the issue of custody under Miranda. (*Stansbury v. California*, *supra*, 511 U.S. at p. 323.)

Under the totality of the circumstances, a reasonable person in appellant's position would not have believed herself to be in custody when Officer Benz questioned her. Accordingly, the trial court did not err in admitting the evidence.

B.     *The Aiding and Abetting Instruction.*

Appellant contends that the trial court erred in instructing the jury with the prosecution's special instruction that it did not have to unanimously agree upon, or individually determine, whether appellant was the direct perpetrator or an aider and abettor. The instruction was improper, according to appellant, because it "deprive[d] appellant of the jury's unanimous verdict beyond a reasonable doubt on every element of the crimes" and relieved the individual jurors "of actually making this factual decision on an element of the crimes charged."

Counsel for both codefendants objected to the aiding and abetting instructions requested by the prosecution, claiming they were unsupported by the evidence. The trial court overruled the objections and instructed the jury as follows:

"A person may be guilty of a crime in two ways:

"One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted the perpetrator who directly

13

committed the crime. A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator. Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime.

"To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

"One, the perpetrator committed the crime; two, defendant knew that the perpetrator intended to commit the crime; three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and, four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

"If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

The prosecutor also requested, and the trial court provided, a supplemental special instruction on aiding and abetting: "Those who aid and abet a crime and those who directly perpetrate the crime are principals and equally guilty of the commission of that crime. You need not unanimously agree, nor individually determine, whether a defendant is an aider and abettor or a direct perpetrator. The individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he or she was the aider and abettor, but no such doubt that he or she was one or the other."

14

Appellant contends that instructing the jury that it did not have to unanimously determine whether she was the direct perpetrator or an aider and abettor violated her due process rights. Specifically, she argues that this instruction deprived her of her federal constitutional rights to due process and a fair trial and her state constitutional right to a unanimous jury verdict based on facts found true beyond a reasonable doubt by each juror by lowering the prosecution's burden of proof on each element.

On appeal, we apply the de novo standard of review to claims of instructional error. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581; *People v. Posey* (2004) 32 Cal.4th 193, 218.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretations.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

In *People v. Ortiz* (2012) 208 Cal.App.4th 1354, our colleagues in the Fourth District recently summarized the applicable law: "In a criminal case, a defendant has the constitutional right to a unanimous jury verdict. (Cal. Const., art. I, § 16; *People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) Furthermore, 'the jury must agree unanimously the defendant is guilty of a specific crime.' (*Russo*, at p. 1132.) 'Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.] [¶] This requirement of unanimity as to the criminal act "is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed." ' (*Ibid.*)

"However, 'where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the

15

cases often put it, the "theory" whereby the defendant is guilty.' (*Russo*, *supra*, 25 Cal.4th at p. 1132.)  'It is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of [a crime] as that offense is defined by statute, it need not decide unanimously by which theory he is guilty.' (*People v. Santamaria* (1994) 8 Cal.4th 903, 918 [(*Santamaria*)].)  *Russo* discussed examples of when there are multiple, discrete crimes requiring a unanimity instruction and when there is only one discrete crime based on multiple theories not requiring a unanimity instruction. (*Russo*, at pp. 1132-1133.)  '[T]ypical examples include the rule that, to convict a defendant of first degree murder, the jury must unanimously agree on guilt of a specific murder but need not agree on a theory of premeditation or felony murder [citation], and the rule that the jury need not agree on whether the defendant was guilty as the direct perpetrator or as an aider and abettor as long as it agreed on a specific crime [citation].' (*Id*. at p. 1133.)  Furthermore, '[n]ot only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt.  Sometimes, . . . the jury simply cannot decide beyond a reasonable doubt exactly who did what.  There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other.' (*Santamaria*, at p. 919, [italics omitted].)" (*People v. Ortiz*, *supra*, 208 Cal.App.4th at pp. 1374-1375; see also *People v. McCoy* (2001) 25 Cal.4th 1111, 1120 ["It is often an oversimplification to describe one person as the actual perpetrator and the other as the aider and abettor.  When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator. . . . In another shooting case, one person might lure the victim into a trap while another fires the gun; in a stabbing case, one person might restrain the victim while the other does the stabbing.  In either case, both participants would be direct perpetrators as well as aiders and abettors of the other.  The aider and abettor doctrine merely makes aiders and abettors liable for their accomplices' actions as well as their own.  It obviates the necessity to decide who was

the aider and abettor and who the direct perpetrator or to what extent each played which role."].)

An instruction similar to the one given in this case was upheld as proper in *People v. Culuko* (2000) 78 Cal.App.4th 307 (*Culuko*), in which the defendant, Culuko, the child's mother, was convicted of second degree murder, fatal assault on a child under the age of 8, and felony child abuse, under facts from which the jury could conclude that either Culuko or her cohabiting boyfriend struck the fatal blow to the child. (*Id*. at pp. 313-320.) On appeal, Culuko claimed that the instruction impermissibly permitted the jury to find her guilty of murder without a finding of malice. The court rejected the contention that it was error to give the instruction, pointing out that in fact the jury did have to find that either Culuko or her boyfriend harbored malice, the "obvious candidate" being the one who delivered the fatal blow. The jury simply did not have to determine whether that defendant was Culuko or the boyfriend. (*Id*. at p. 323.)

The *Culuko* court also noted that the instruction was a correct statement of law, deriving from cases holding that the jury need not agree unanimously on whether the defendant was the perpetrator or the aider and abettor. Regarding Culuko's challenge to the portion of the instruction stating that each individual juror did not have to decide whether any given defendant was the perpetrator or the aider and abettor, the court noted that this aspect of the instruction was nearly a direct quote from the Supreme Court's opinion in *Santamaria*, *supra*, 8 Cal.4th at page 919: " 'Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. Sometimes, as probably occurred here, the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other.' The court concluded it would be 'absurd . . . to let the defendant go free because each individual juror had a reasonable doubt as to his exact role.' (*Id*., at p. 920, fn. 8; accord, *People v. Garrison* [(1989)] 47 Cal.3d [746,] 781-782.)" (*Culuko*, *supra*, 78 Cal.App.4th at pp. 323-324.)

17

Appellant's argument that the special instruction allowed the jury to return a guilty verdict without finding unanimously that she was guilty beyond a reasonable doubt is without merit. The jury reached a unanimous verdict that appellant was guilty of gross vehicular manslaughter while intoxicated (count 1), driving under the influence causing injury (count 2), driving with 0.08 percent blood alcohol causing injury (count 3), and driving while the privilege was suspended for driving with a specified blood alcohol level and when she had knowledge of the suspension (count 4). The court instructed the jury in all the elements of each offense; in all the requirements for aider and abettor liability; that appellant was presumed innocent; and that "this presumption require[d] that the People prove a defendant guilty beyond a reasonable doubt." The jury was also instructed to "[p]ay careful attention to all of these instructions and consider them together." These instructions, together with the challenged instruction, unambiguously placed the burden of proof beyond a reasonable doubt on the prosecution on every element.

Appellant contends that she is entitled to a jury verdict on all facts that are elements of the crimes charged as opposed to alternate ways to commit the crime. She argues that, here, "the act of driving is an element of vehicular manslaughter (§ 192, subd. (c)(1), (2) & (3)) and driving under the influence (Vehicle Code, § 23153, subd. (a), (b)) and so must be proven to the jury beyond a reasonable doubt." Appellant relies on *Schad v. Arizona* (1991) 501 U.S. 624, in which the United States Supreme Court upheld instructions permitting the jury to reach one unanimous murder verdict based on various mental state findings pertaining to premeditation or felony murder. (*Id*. at pp. 644-645.) Appellant cites the portion of the opinion in which the court cautioned that a defendant has a due process right to understand with specificity the charges against him, and that it is an assumption of our criminal justice system that "no person may be punished criminally save upon proof of some specific illegal conduct." (*Id*. at p. 632.) According to appellant, "[i]f an individual juror was not sure that appellant was the driver of the vehicle and not sure about whether she was an aider and abettor, then appellant should not have been convicted."

18

We disagree. As we have stated, the jury reached a unanimous verdict against appellant for the vehicular manslaughter and driving under the influence charges. Appellant's contentions are unavailing under settled authority that as long as each juror is convinced beyond a reasonable doubt that a defendant has committed an offense, the jury need not decide unanimously as between several proffered theories of liability. (*People v. Wilson* (2008) 44 Cal.4th 758, 801 (*Wilson*); *Russo*, *supra*, 25 Cal.4th at pp. 1132, 1133.) "Thus, the jury need not decide unanimously whether a defendant was a direct perpetrator or an aider and abettor, so long as it is unanimous that he was one or the other." (*Wilson*, *supra*, 44 Cal.4th at p. 801; *Russo*, *supra*, 25 Cal.4th at p. 1133; *People v. Santamaria*, *supra*, 8 Cal.4th at pp. 918-919.)

Appellant also argues that the instruction encouraged the jury to find her guilty if she engaged in conduct that comprised only one element of the charged crime, the target crime, or aiding and abetting, without finding each and every element beyond a reasonable doubt. Under this approach, according to appellant, "the other occupants of the car could also have been accomplices insofar as they all knew appellant was sitting on Thompson's lap and agreed to be driven under those circumstances." Appellant bases her argument on *People v. Cook* (1998) 61 Cal.App.4th 1364, 1369, in which the court concluded that if a codefendant engaged in conduct that comprised one element of the charged crime, he was a perpetrator, not an aider and abettor, and aiding and abetting instructions need not be given. (*Id*. at p. 1371.)[3] This ruling was rejected as unconstitutional by the federal district court on habeas review. (*Cook v. Lamarque* (E.D. Cal. 2002) 239 F.Supp.2d 985, 995.)

This contention is meritless. The court instructed the jury on the specific elements of aider and abettor liability, that the People must prove each of the requirements, and

---

[3] After the instant appeal was fully briefed, the California Supreme Court issued *People v. Delgado* ( 2013) 56 Cal.4th 480, 489, fn. 3, which specifically disapproved *People v. Cook, supra,* 61 Cal.App.4th 1364, to the extent that it held "aiding and abetting instructions need not be given if the evidence shows the defendant personally performed *any* element of the charged offense . . . ."

that "[w]henever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt." The court also instructed on the elements of each of the underlying offenses. At no time did the court instruct the jury that it could find appellant guilty without finding all the elements in a particular offense true beyond a reasonable doubt. There was no evidence whatsoever that Jalisha Harris and Everett Jackson specifically intended to, and did in fact, aid, facilitate, promote, encourage, or instigate appellant's commission of the charged offenses.

Next, appellant argues that the challenged instruction was improper because it allowed the jury to convict appellant "on a single act without agreeing unanimously on that act." Relying on the dissent in *Culuko*, appellant argues that, although a jury need not unanimously determine whether a defendant was a perpetrator or an aider and abettor of a single crime when more than one theory of liability is presented, "unanimity is still required when the jurors could disagree on which act constituting the charged crime was committed by the defendant." (*Culuko*, *supra*, 78 Cal.App.4th at pp. 342-343, dis. opn. of McKinster, P.J., and cases cited therein.) Specifically, appellant contends that appellant's guilt was based on a single act, not a course of conduct, and the jury could have disagreed on whether "only one of the defendants [appellant or Thompson] was in control of the vehicle or if they actually shared control." Under the challenged instruction, posits appellant, "the jury could have found both defendants guilty as aiders and abettors without a single juror actually finding that either defendant was the driver of the car." Appellant also suggests the possibility that appellant got into the front seat and "became unconscious while Thompson drove," in addition to the possibility that the jury could have found appellant guilty without finding beyond a reasonable doubt that she acted with gross negligence or intended to aid and abet a target crime.

These contentions have no merit because the basis of liability here was not discrete acts. It is settled that a unanimity instruction is not required where the offenses are so closely connected as to form a single transaction or where the offense itself consists of a continuous course of conduct. (*People v. Diedrich* (1982) 31 Cal.3d 263, 282.) " ' "This exception arises in two contexts. The first is when the acts are so closely

20

connected that they form part of one and the same transaction, and thus one offense. [Citations.] The second is when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time. [Citation.]" ' " (*People v. Napoles* (2002) 104 Cal.App.4th 108, 115 (*Napoles*).)

As one court has put it, the "continuous [course of] conduct" exception " 'is quite limited. There is a fundamental difference between a continuous crime spree and continuous conduct resulting in one specific offense. The continuous conduct exception only really applies, if at all, to those types of offenses where the statute defining the crime may be interpreted as applying, on occasion, to an offense which may be continuous in nature such as failure to provide, child abuse, contributing to the delinquency of a minor, driving under the influence and the like [citations].' " (*People v. Metheney* (1984) 154 Cal.App.3d 555, 561.) The continuous course of conduct exception, therefore, is "limited . . . to those cases where the two or more criminal acts are closely connected in time so that they form part of one transaction or the crime is the type of offense which *in itself* consists of a continuous course of conduct such as pandering, child abuse or contributing to the delinquency of a minor. [Citation.]" (*Id*. at p. 561.)

Thus, in *Napoles*, *supra*, 104 Cal.App.4th at pages 116-117, the People charged defendants with one count of felony child abuse, occurring between two specific dates. In concluding that the trial court erred in giving a unanimity instruction because the offenses formed a continuous course of conduct, the court explained that the charging language "alerts the jury that the charge consists of a continuous course of conduct, to be proved by evidence of more than one individual act. Thus, from the trial's inception, the jury was aware that this was not a case where one illegal act is charged and several are proven—a case, in other words, requiring a special instruction to protect the defendant's right to a unanimous jury." (*Id*. at p. 117.) The court also pointed out that the evidence presented at trial of " 'a systematic pattern of abuse rather than separate, isolated incidents' " (*ibid*.) was consistent with a continuous course of conduct theory.

Here, the evidence presented a course of conduct resulting in driving under the influence offenses including gross vehicular manslaughter. The evidence did not present

21

multiple possible instances of these offenses; that is, there were not multiple acts of gross vehicular manslaughter or driving under the influence, nor were there multiple acts of driving.

Finally, even if it was error to give the challenged instruction, any error was harmless beyond a reasonable doubt. (*People v. Vanegas* (2004) 115 Cal.App.4th 592, 602 ["An instructional error which creates an improper mandatory presumption falls within the category of trial error subject to *Chapman* [*v. California* (1967) 386 U.S. 18, 24] review."].) The jury was properly instructed to consider the instructions as a whole and that the prosecution had the burden of proving appellant's guilt beyond a reasonable doubt. The jury is presumed to have followed these instructions. (*People v. Mills* (1991) 1 Cal.App.4th 898, 918 [presumption that jurors are intelligent and capable of correlating all jury admonitions and instructions]; *People v. Ryan* (1981) 116 Cal.App.3d 168, 179 [jury is presumed to have followed instructions and obeyed the law].)

The evidence was overwhelming that appellant was guilty beyond a reasonable doubt. Appellant was seen drinking on several occasions throughout the day and evening. She drove the Lexus earlier in the evening to drop off and then pick up Jalisha Harris and to pick up Damarcus Thompson and Everett Jackson. Appellant sat on Thompson's lap in the driver's seat on an approximately four mile drive which included numerous turns and at least seven controlled intersections, culminating in the crash. Appellant's blood-alcohol content within hours after the crash was recorded as .10 and .12 percent. The weight of the evidence supports the finding that appellant drove while impaired in a reckless and grossly negligent manner. In light of the other instructions and the evidence, any error in giving the challenged instruction was harmless beyond a reasonable doubt. (*Chapman v. California*, *supra*, 386 U.S. at p. 24.)

C.     *The Driving Instruction*.

Appellant contends the trial court erred in giving the following instruction based on CALCRIM No. 2241: "A driver is a person who drives or is in actual physical control of a vehicle. [¶] A person drives a vehicle when he or she intentionally causes it to move by exercising actual physical control over it. The person must cause the vehicle to move,

22

but the movement may be slight." The problem with this instruction, according to appellant, is the phrase, "actual physical control." Under *Mercer v. Department of Motor Vehicles* (1991) 53 Cal.3d 753 (*Mercer*), the jury should have been told that the person driving was the one who intentionally caused the car to move. Under this interpretation, appellant continues, if appellant had her hands on the steering wheel but Thompson had his foot on the accelerator and the brake, then it was Thompson who had "actual physical control" and caused the car to move.

Appellant is correct that "the jury should have been told that the person driving was the same one who intentionally caused the car to move." And the jury was so instructed, as is evident from the quoted language above.

We find the instruction is a correct statement of the law. First, it tracks the language of Vehicle Code section 305, which provides in part: "A 'driver' is a person who drives or is in actual physical control of a vehicle."

Second, although "the term 'drive' is not defined in the Vehicle Code," case law holds "the term 'drive' means to steer or control a vehicle in motion." (*Padilla v. Mease* (1986) 184 Cal.App.3d 1022, 1027; see *In re F.H.* (2011) 192 Cal.App.4th 1465, 1472 [By grabbing the wheel, which caused the vehicle to change directions and crash, the defendant "displaced the driver's control and operation of the vehicle and made herself the driver as she exercised actual physical control over the vehicle."]); *People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1155 [holding that both defendants were driving the vehicle under the influence of alcohol where one operated the steering wheel and the other operated the stick shift and pedals]; *In re Queen T.* (1993) 14 Cal.App.4th 1143, 1145 [The defendant's "act of steering the car, although she was not operating the accelerator or brakes, renders her a 'driver' within the meaning of [Vehicle Code] sections 305 and 23153."].)

Finally, the question posed in *Mercer* was a narrow one, as the court itself articulated: "We now turn to the essential question posed in this case, namely, whether an officer may make a 'lawful arrest' for 'drunk driving' in violation of section 23152[, subdivision] (a), if the arrestee's vehicle is lawfully parked and the officer has not

observed the vehicle move." (*Mercer*, *supra*, 53 Cal.3d at p. 761.)  We had occasion recently to discuss *Mercer* in *People v. Nelson* (2011) 200 Cal.App.4th 1083 (*Nelson*): ". . . Mercer was found by police asleep and slumped over the wheel of a car legally parked, its engine running.  (*Mercer*, at p. 756.)  He refused chemical tests after his warrantless arrest for violation of section 23152.  (*Mercer*, at pp. 756-757.)  The court extensively analyzed the meaning of the term 'drive' to determine if Mercer was lawfully arrested for a violation of section 23152 in the absence of evidence that the arresting officer observed his vehicle move, so as to answer the ultimate question of whether his driver's license could be suspended or revoked by statute because he refused the chemical tests.  (*Mercer*, at pp. 757-758.)  In doing so, the court drew a distinction between 'drive' and 'operate.' " (*Nelson*, at p. 1091.)  In a subsequent case, the Supreme Court emphasized the limited applicability of *Mercer* when it stated, "[i]n *Mercer*, . . . the issue was whether the 'lawful arrest' requirement of the implied consent statute [citation] . . . had been met where, under the law then in effect, the officer lacked statutory authority to effect a warrantless misdemeanor arrest for a driving-while-under-the-influence offense that was not committed in the officer's direct presence." (*Troppman v. Valverde* (2007) 40 Cal.4th 1121, 1136, fn. 11.)  *Mercer* does not support appellant's narrow definition of driving.  The instruction as given was correct.

D.      *No Cumulative Prejudice*.

Appellant contends that the errors in this case cumulatively resulted in a trial that was fundamentally unfair and that the combined prejudicial effect of all the errors requires reversal.  We disagree.  None of the claimed errors actually constitute errors, and thus there is no prejudice to cumulate.

E.      *Correction of the Sentence*.

In her reply brief,[4] appellant raises a sentencing error that was brought to her attention by respondent.  As to count 2, a subordinate offense, the trial court imposed

---

[4] Along with her reply brief, appellant filed a motion for permission to raise this issue on reply.  We granted the motion.

24

full-term sentences for two great bodily injury enhancements under Penal Code section 12022.7, subdivision (a), and two multiple injury enhancements under Vehicle Code section 23558.  However, section 1170.1, subdivision (a), provides that the subordinate term for each consecutive offense "shall include one-third of the term imposed for any specific enhancements applicable to those subordinate offenses."  Thus, the full-term sentence enhancements on count 2 were unauthorized.

Appellant requests that we remand the matter to the trial court with instructions to impose one-third of the middle term on these enhancements on remand.  Respondent contends that the proper remedy would be to remand for resentencing.  We agree with respondent that the error requires a remand for resentencing.  (See *People v. Rodriguez* (2009) 47 Cal.4th 501, 509 ["remand will give the trial court an opportunity to restructure its sentencing choices"]; *People v. Navarro* (2007) 40 Cal.4th 668, 681 ["remand for a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances"].)

## IV.  DISPOSITION

The sentence is vacated and the matter is remanded for resentencing on all counts. In all other respects, the judgment is affirmed.


_____
Haerle, Acting P.J.


We concur:


_____
Lambden, J.


_____
Richman, J.