Filed 6/16/14  P. v. Soria CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JUAN CARLOS SORIA,<br><br>        Defendant and Appellant. | A137607<br><br>(Alameda County<br>Super. Ct. No. H52558) |

Defendant Juan Carlos Soria appeals his conviction, following a bench trial, of aiding and abetting an assault on a police officer (Pen. Code, § 245, subd. (c))[1] and misdemeanor obstruction of a police officer (§ 148). Defendant contends that the court erred in denying his motion for judgment of acquittal under section 1118.1 and that his conviction for the violation of section 245, subdivision (c) is not supported by substantial evidence. Although the evidence supporting this conviction is slim and based on conduct of but a few seconds, the trial court carefully considered the evidence under the correct standard and we find no basis to second guess its findings.

**Background**

Around 10:00 p.m. on the evening of June 24, 2012, defendant was walking on the street beside Dario Franco, who was riding a bicycle, near Princeton and A Streets in Hayward. Police Officer Jacqueline Meehleib, patrolling in a marked patrol car, observed that Franco's bicycle had no bike light, a violation of the Vehicle Code, and activated her

---

[1] All statutory references are to the Penal Code.

lights and siren and told Franco to stop. When the officer got out of the police car, Franco met her with profanity, refused to show her his hands as she directed, ultimately threw a padlock at her and was then hit by a taser fired by the officer. Franco screamed in pain; defendant disregarded Meehleib's order to stay back and pulled the taser probes from Franco's body. Franco then rose from the ground and attacked Meehleib, who fell to the ground where Franco continued to punch and kick her. When Meehleib believed that Franco was reaching for her firearm, she shot him in the leg. Backup arrived at the scene and Franco was taken into custody. There is no dispute in the evidence as to these abbreviated facts.

The evidence is less clear as to defendant's actions while Franco was physically attacking the felled officer. Meehleib's testimony sheds no light on defendant's movements while she was on the ground. Gurmail Billa, who was working at a liquor store on A Street outside of which the altercation was occurring, came to Meehleib's assistance, together with his father who was also working at the liquor store. Billa testified: "When she fell on the sidewalk, I was trying to hold [Franco][2] who was coming to attack her. I was holding him by his arms so — and telling him not to fight with her. And at that time, the second male [defendant] also came running from in front of the other store towards there. I pushed the second male, and since he was slim, I pushed him and his shirt came into my hand. And I was telling him, 'Go back, go back, man.' And he was saying, 'They don't like us.' And when I pushed him back, by that time the guy from the other store [Vikram Kohli] also came out and he held him and took him to the other side." "When he [defendant] came close to us and the police officer, and he had his hands raised with his fists like this, and he was saying, 'They don't like us, they don't like us.' I — I held his shirt and I just gave him a shove, and then Kohli took him back." After Officer Meehleib shot Franco, Billa testified, defendant again disregarded her order and tried to lift Franco from the ground before backup assistance arrived and arrested both Franco and defendant.

_____

[2] Franco was referred to at trial as "Chipi."

Vikram Kohli, who worked at a market next to the liquor store, also heard the disturbance and came to Meehleib's assistance. He testified that when he came out of the market he observed Billa and his father "trying to hold" Franco who was "still over the police officer." Then, defendant "ran towards his friend" and Kohli "went and grabbed him." Asked why he did so, Kohli testified, "I was afraid that . . . both of them might attack the police officer and kill her." When defendant started to run towards Franco, Kohli testified he "grabbed his hand." Asked if defendant resisted, he answered, "I held him very strongly. He was trying, but, you know, I had him real fast." At the time, defendant appeared angry.

Defendant testified in his own defense, acknowledging much of the testimony of Billa and Kohli, but asserting that when he was stopped by the two men from approaching the physical skirmish, he was going "to get [Franco] off" the officer. Billa and his father were holding Franco and he [defendant] "was trying to do the same, but they pulled [defendant] away."

A videotape from a surveillance camera inside the liquor store was introduced in evidence.[3] The video captures the doorway of the store, looking out towards the street, and a few seconds of the action taking place outside. Defendant's brief on appeal describes what is depicted in the video as follows: "[Defendant] can be seen on the videotape . . . entering the frame of the store's doorway. In the same doorway, Billa can be seen turning to [defendant], grabbing his shirt, and pushing him away. At this same moment, Mr. Kohli wrapped his arms around [defendant] and successfully pulled him away. On the videotape, [defendant's] T-shirt is still in Billa's grip and can be seen being stretched out as Kohli pulled [defendant] away from Billa."

The trial court ultimately explained what it observed on the videotape and the basis for its findings, in relevant part, as follows: "[D]uring trial we have spent, it seems like hours, going through these videotapes with different witnesses and we've slowed the

_____

[3] A second videotape from outside the store was also received but the court indicated that little was visible on it because of poor lighting and no party suggests that it shows anything of assistance in resolving the current appeal.

3

videotapes down to where we could look at it at one or two or ten frames per second, twenty frames per second in some of the more critical seconds of this two-minute venture. . . . But an event that unfolds in a matter of seconds or minutes, I don't think can be analyzed frame-by-frame. That's not the way life is. Life happens . . . not in slow motion, but in real time. . . . I have looked at that video from within the store. Looking at Mr. Billa's back, you can see him watch from the doorway the motion from his left to his right to basically right in front of him on his right. He moves out of the store when Franco is either kicking or on top of Officer Meehleib. He is in the process of pulling back Franco, or pulling on Franco, or somehow pulling Franco away from Officer Meehleib when from his left shoulder area in the video, in regular motion, it's very clear that his left shoulder comes back because [defendant] is pulling on him. After that, [defendant]is being pulled — by his testimony — it's not visible, but by his testimony he's being pulled by Mr. Kohli, the shop merchant from the next shop over, away. So by [defendant's] testimony and by Mr. Kohli's testimony . . . when you look from the indoor camera into — through that doorway, the one guy is pulling Franco off and [defendant] comes up and pulls him off, just — and pulls Mr. Billa off from his left shoulder, and then they kind of give it a, one of these things, and Billa's hand ends up holding [defendant's] shirt. . . . [T]he court does find . . . that by pulling off the guy who's trying to hold Franco, that's aiding and abetting Franco in continuing the assault at whatever stage of the assault he's in. . . . [T]hat's the court's finding as I look at the video. The video is there for anybody to review."

Defendant was charged with assault on a peace officer (§ 245, subd. (c) (count one)), battery with injury on a peace officer (§ 243.5, subd. (c)(2) (count two)), and resisting a peace officer (§ 69 (count three)), with criminal street gang allegations as to each count. (§§ 186.22, subd. (b)(1), 667.5, subd. (c).) (Franco was charged and tried separately.) The trial court subsequently granted a defense motion for judgment of acquittal as to counts two and three, but determined that misdemeanor obstruction of a peace officer (§ 148) was shown by the evidence. The court found defendant guilty of count one and the misdemeanor charge on count three, and found the gang enhancement

4

true as to count one. The court suspended imposition of sentence and placed defendant on probation for five years, conditioned on serving 361 days in county jail with credit for 361 days time served. Defendant has timely appealed.

## Discussion

Defendant contends the evidence is insufficient to sustain his conviction for aiding and abetting Franco's assault on Officer Meehleib. He argues that there is no evidence that shows he intended to encourage or facilitate the commission of the assault, which unquestionably is an element of the offense. (*People v. Cook* (1998) 61 Cal.App.4th 1364, 1368-1369, disapproved on other grounds in *People v. Delgado* (2013) 56 Cal.4th 480, 489, fn. 3.) We review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value that would permit a rational trier of fact to find the defendant guilty beyond a reasonable doubt. (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) " '[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

As the trial court acknowledged, although defendant disregarded Meehleib's command to stay away from Franco when he removed the taser prongs from Franco's body, there is no reason to believe that at that point he knew that Franco would proceed to assault the officer or that by removing the prongs defendant intended to facilitate such an attack. Nonetheless, the evidence is undisputed that while Franco was assaulting Meehleib on the ground, defendant ran towards them, interfering with Billa's efforts to pull Franco from the officer. Defendant maintains that he intended to help pull Franco away from the officer rather than to aid in the assault. He argues that the momentary action captured on the videotape does not show him "pulling" Billa away from Franco, as the trial court stated, and that neither Billa nor Kohli testified that he attempted to do so. However, although the action shown on the videotape is fleeting and difficult to decipher, the trial court watched the scene repeatedly at multiple speeds and correlated the action with the testimony of the percipient witnesses. Both Billa and Kohli considered defendant

5

as coming to assist Franco. Prior to Meehleib falling to the ground, defendant like Franco had addressed the officer with obscenities and refused to heed her instructions. The anger on defendant's face as he approached the struggle was most reasonably interpreted as directed to Meehleib and not to his friend and fellow gang member. His words as he approached — "They don't like us, they don't like us" — do not suggest that defendant was urging Franco to desist, but rather that he was urging him on. Defendant said nothing then or later indicating he was trying to restrain Franco. And after Franco was shot in the leg, defendant again refused to follow Meehleib's instructions and went to Franco's assistance. Thus, although the evidence is such that the court might have reached a different conclusion, we cannot say that there is no evidentiary support for the finding that defendant intended to aid and abet the commission of Franco's assault on the police officer.

## Disposition

The judgment is affirmed.

_____
Pollak, J.

We concur:

_____
McGuiness, P. J.

_____
Siggins, J.

6